******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# JONATHAN R. MORIS *v.* INVATA HOLDINGS, INC., ET AL.
## (AC 48428)

Westbrook, Wilson and DiPentima, Js.

*Syllabus*

The plaintiff appealed from the trial court's judgment granting the defendant's motion to dismiss for lack of personal jurisdiction. The plaintiff claimed, inter alia, that the court improperly concluded that exercising personal jurisdiction over the defendant would violate the federal due process requirement of minimum contacts with the forum. *Held*:

The trial court properly dismissed the complaint against the defendant for lack of personal jurisdiction, as the plaintiff failed to establish that the defendant had sufficient minimum contacts with Connecticut to justify the exercise of personal jurisdiction.

The plaintiff's claim that the trial court improperly overlooked the defendant's alleged noncompliance with discovery was unavailing, as the plaintiff's argument that this court should, essentially, impose a discovery sanction on the defendant by deeming its appellate argument fundamentally compromised due to alleged discovery violations at the trial level had no basis in the law, and the plaintiff failed to meet his burden to demonstrate on appeal that his claims were sufficiently meritorious to warrant reversal of the trial court's judgment.

Argued January 7—officially released July 7, 2026

*Procedural History*

Action to recover damages for, inter alia, breach of contract, and for other relief, brought to the Superior Court in the judicial district of New Britain, where the court, *Smith, J.*, granted in part the defendants' motion to dismiss and rendered judgment thereon, from which the plaintiff appealed to this court. *Affirmed*.

*Paul Fenaroli*, with whom, on the brief, were *Joseph M. Pastore III* and *Melissa Rose McClammy*, for the appellant (plaintiff).

*Christopher R. Drury*, with whom, on the brief, were *Thomas C. Blatchley* and *Justyn P. Stokely*, for the appellee (named defendant).

*Opinion*

WESTBROOK, J. The plaintiff, Jonathan R. Moris, brought the underlying civil action against several defendants alleging judicial dissolution, breach of a shareholders' agreement, breach of an employment agreement, fraud, conversion, unjust enrichment, negligent misrepresentation, violations of the Connecticut Uniform Securities Act, General Statutes §36b-2 et seq., and unpaid wages pursuant to General Statutes §31-71b. The plaintiff now appeals from the judgment of the trial court granting the motion to dismiss filed by the defendant Invata Holdings, Inc. (Invata Holdings),[1] for lack of personal jurisdiction. The plaintiff claims that the court improperly (1) concluded that exercising personal jurisdiction over Invata Holdings would violate the federal due process requirement of minimum contacts with the forum and (2) overlooked Invata Holdings' alleged discovery misconduct. We disagree and, accordingly, affirm the judgment of the trial court.

In its memorandum of decision on the motion to dismiss, the trial court noted the following facts as alleged by the plaintiff. "The plaintiff is an individual residing in Burlington, Connecticut. Invata Holdings is a Pennsylvania corporation with a principal place of business in Conshohocken, Pennsylvania. [Ayman] Labib is an individual residing in Lexington, Massachusetts.

"In 2010, the plaintiff and [Ryan] Sheehan incorporated an entity known as Invata, Inc., in Connecticut. At the end of 2011, Invata, Inc., merged with Glen Road Systems, Inc., a Pennsylvania corporation. In connection

---

[1] The complaint also named as defendants Ryan Sheehan and Ayman Labib. Sheehan, Labib, and Invata Holdings filed a motion to dismiss for lack of personal jurisdiction. After the filing of the motion to dismiss, the court, *Morgan, J.*, determined that, due to Sheehan's noncompliance with discovery related orders and his failure to appear at a hearing, personal jurisdiction over him was deemed to have been established. The court, *Smith, J.*, granted the motion to dismiss as to Invata Holdings and Labib. Only Invata Holdings participated in the present appeal and, accordingly, references to the defendant throughout this opinion are to Invata Holdings only.

with the merger, the plaintiff entered into an employment agreement with Glen Road Systems, Inc., and emerged as a 19 percent equity shareholder of Glen Road Systems, Inc., pursuant to a shareholders' agreement. The plaintiff alleges that Invata Holdings and Labib later agreed to be bound—and presently are bound—by that shareholders' agreement.

"At some point prior to 2019, Glen Road Systems, Inc., changed its name back to Invata, Inc. On January 27, 2020, Invata, Inc., completed a 'reorganization' through which Invata, Inc.'s existing shareholders formed a holding company, Invata Holdings, and contributed their existing shares to the capital of Invata Holdings. Invata, Inc., was then designated a subsidiary of Invata Holdings. Thereafter, Invata, Inc., was converted to a limited liability company. As a result of the reorganization, the plaintiff, Sheehan, and Leith Kuhn (a nonparty) became the sole shareholders and the directors of Invata Holdings. In or around February of 2020, Labib joined Invata Holdings as a shareholder. On or about April 15, 2020, the plaintiff and the other shareholders of Invata Holdings agreed to temporarily reduce their salar[ies] due to the economic impact of the COVID-19 pandemic. Invata Holdings represented to the plaintiff that the company would restore the plaintiff's salary to the prior rate on or around June 16, 2020, and further represented that the plaintiff's lost salary would be repaid dependent on the performance of Invata Holdings going forward. From April 15, 2020, to the date of the complaint, the plaintiff had not received any salary from Invata Holdings. In late 2020 into early 2021, Sheehan told the plaintiff that Sheehan was working on getting the plaintiff reincorporated into the day-to-day activities of Invata Holdings. In or around June of 2021, the plaintiff and Sheehan discussed a potential buyout of the plaintiff's equity in Invata Holdings. In response to the plaintiff's repeated requests for a distribution, Sheehan emailed the plaintiff a proposed separation agreement and stock purchase agreement on April 28, 2022. The plaintiff declined the offers, believing he did not have sufficient

information to make an informed decision due to the failure of Invata Holdings to provide the plaintiff with financial records or reports to assess the true value of the plaintiff's equity.

"On September 7, 2022, the plaintiff delivered a letter to Invata Holdings proposing a buyout of the plaintiff's equity. To date, Invata Holdings has not paid or responded. Therefore, the plaintiff alleges, as of January 1, 2023, Invata Holdings has constructively terminated the plaintiff by expelling him from all material aspects of Invata Holdings."

In 2023, the plaintiff commenced the present action against, inter alia, Invata Holdings alleging judicial dissolution, breach of the shareholders' agreement, breach of the employment agreement, fraud, conversion, unjust enrichment, negligent misrepresentation, violations of General Statutes § 36b-29 (a) and (c), and unpaid wages pursuant to § 31-71b.

Invata Holdings filed a motion to dismiss on the ground that the court lacked personal jurisdiction over it under the applicable corporate long arm statute, General Statutes § 33-929, and appended a supporting memorandum of law and exhibits. The plaintiff filed an opposition, arguing that the court had personal jurisdiction over Invata Holdings pursuant to § 33-929, and appended a memorandum of law and exhibits. Invata Holdings filed a reply.

In order to place the trial court's decision in proper context, we note the following relevant legal standards and principles. "A motion to dismiss tests, inter alia, whether, on the face of the record, the court is without jurisdiction. . . . Because a jurisdictional challenge presents a question of law, our review is plenary." (Citation omitted; internal quotation marks omitted.) *North Sales Group, LLC* v. *Boards & More GmbH*, 340 Conn. 266, 269, 264 A.3d 1 (2021).

"When a defendant challenges personal jurisdiction in a motion to dismiss, the court must undertake a two

part inquiry to determine the propriety of its exercising such jurisdiction over the defendant. The trial court must first decide whether the applicable state [long arm] statute authorizes the assertion of jurisdiction over the [defendant]. If the statutory requirements [are] met, its second obligation [is] then to decide whether the exercise of jurisdiction over the [defendant] would violate constitutional principles of due process." (Internal quotation marks omitted.) Id., 273. "When a motion to dismiss for lack of personal jurisdiction raises a factual question [that] is not determinable from the face of the record, the burden of proof is on the plaintiff to present evidence [that] will establish jurisdiction. . . . If the defendant challenging the court's personal jurisdiction is a foreign corporation or a nonresident individual, it is the plaintiff's burden to prove the court's jurisdiction." (Citation omitted; internal quotation marks omitted.) *Cogswell* v. *American Transit Ins. Co.*, 282 Conn. 505, 515, 923 A.2d 638 (2007).

"As articulated in the seminal case of *International Shoe Co.* v. *Washington,* 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945), the constitutional due process standard requires that, in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. . . . In other words, [t]he [d]ue [p]rocess [c]lause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful contacts, ties, or relations. . . . By requiring that individuals have fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign . . . the [d]ue [p]rocess [c]lause gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit . . . . The due process test for personal jurisdiction has two related components: the minimum

contacts inquiry and the reasonableness inquiry. The court must first determine whether the defendant has sufficient contacts with the forum state to justify the court's exercise of personal jurisdiction. . . .

"For the purposes of this initial inquiry, the Supreme Court of the United States has articulated, and this court has recognized, two types of personal jurisdiction. Either specific jurisdiction or general jurisdiction can satisfy the constitutional requirement of sufficient minimum contacts between the defendant and the forum. A state court will have specific jurisdiction over a nonresident defendant whenever the defendant has purposefully directed [its] activities at residents of the forum . . . and the litigation [has] result[ed] from alleged injuries that *arise out of* or relate to those activities . . . . Whether a given defendant has contacts with the forum state sufficient to satisfy due process is dependent upon the facts of the particular case. Like any standard that requires a determination of reasonableness, the minimum contacts test of *International Shoe Co.* is not susceptible of mechanical application; rather the facts of each case must be weighed to determine whether the requisite affiliating circumstances are present. . . .

"Due process demands more, however, than the existence of minimum contacts between the defendant and the forum state. Once minimum contacts have been established, [t]he second stage of the due process inquiry asks whether the assertion of personal jurisdiction comports with traditional notions of fair play and substantial justice—that is, whether it is reasonable under the circumstances of the particular case." (Citations omitted; internal quotation marks omitted.) *Cogswell* v. *American Transit Ins. Co.*, supra, 282 Conn. 523–25.

In granting the motion to dismiss, the court, *Smith, J.*, determined that, because the shareholders' agreement[2] applies to Invata Holdings, suit is authorized under the applicable long arm statute, § 33-929 (f) (1), which

---

[2]The court determined that the plaintiff did not present evidence that Invata Holdings assumed the obligations of the employment agreement.

provides in relevant part that "[e]very foreign corporation shall be subject to suit in this state, by a resident of this state or by a person having a usual place of business in this state, whether or not such foreign corporation is transacting or has transacted business in this state and whether or not it is engaged exclusively in interstate or foreign commerce, on any cause of action arising . . . [o]ut of any contract made in this state or to be performed in this state . . . ." The court, however, determined that it did not have personal jurisdiction over Invata Holdings because the plaintiff had not established that Invata Holdings had sufficient minimum contacts with Connecticut to satisfy due process. The court then stated that, because the plaintiff had not established minimum contacts, it was not necessary for the court to determine whether the exercise of personal jurisdiction was reasonable under the circumstances of this case. This appeal followed the court's granting of the motion to dismiss.

I

The plaintiff claims that the court improperly determined that exercising personal jurisdiction over Invata Holdings violated the due process requirements of the United States constitution in that it had insufficient "minimum contacts" with the state. We disagree.

The present case involves specific jurisdiction.[3] "In the context of specific jurisdiction . . . the due process

---

[3]The court determined that the present action involves specific jurisdiction only. The plaintiff argues that the court overlooked grounds for general jurisdiction, contending that, "[a]lthough Invata Holdings is a Pennsylvania corporation with its principal place of business in Pennsylvania, it stands in continuity with Invata, Inc.—a Connecticut formed predecessor that was registered to do business in the state until August 2023 and whose operations formed the foundation of the present corporate structure. . . . Invata Holdings is properly treated as the legal and functional successor to Invata, Inc., inheriting its operations, obligations, and jurisdictional contacts. [T]hese inherited contacts— combined with Invata Holdings' own ongoing substantial connections to the state—are arguably sufficient to support general jurisdiction . . . ." (Citation omitted.) The plaintiff's argument fails because, as we explain in more detail later in this opinion, the forum contacts of Invata Inc./Invata, LLC, cannot be imputed to Invata Holdings. With

test can be said to have the following elements: **(1)** the defendant purposefully availed itself of the privilege of conducting activities within the forum, **(2)** the plaintiff's claim arises out of or relates to the defendant's forum related contacts, and **(3)** if the first two elements favor the plaintiff's choice of forum, the exercise of jurisdiction is ultimately fair and reasonable under the circumstances. . . . If the plaintiff cannot prove either of the first two elements, or the defendant prevails on the third element, the forum cannot exercise jurisdiction over the defendant." (Citation omitted; footnote omitted.) *Adams* v. *Aircraft Spruce & Specialty Co.*, 345 Conn. 312, 325, 284 A.3d 600 (2022). The plaintiff argues that Invata Holdings has purposefully and persistently availed itself of the privileges of conducting business in Connecticut by governing itself under a shareholders' agreement executed in this state.

We must determine whether the trial court may constitutionally exercise specific jurisdiction over Invata Holdings by virtue of a shareholders' agreement that the plaintiff had entered into with Glen Road Systems, Inc., in 2012.[4] Although Invata Holdings did not exist in 2012 when the shareholders' agreement was signed, the trial court found that that agreement continued to apply to Invata Holdings, noting that the plaintiff alleged in his complaint that, "[o]n information and belief, [Invata Holdings] . . . later agreed to be bound by the terms of the

that in mind, Invata Holdings does not have contacts with Connecticut that are adequately systematic and continuous so as to confer general jurisdiction. See, e.g., *Adams* v. *Aircraft Spruce & Specialty Co.*, 345 Conn. 312, 323, 284 A.3d 600 (2022) ("General jurisdiction, as its name implies, extends to any and all claims brought against a defendant. . . . Those claims need not relate to the forum [s]tate or the defendant's activity there; they may concern events and conduct anywhere in the world. But that breadth imposes a correlative limit: Only a select set of affiliations with a forum will expose a defendant to such sweeping jurisdiction. . . . In what [is] called the paradigm case, an individual is subject to general jurisdiction in her place of domicile. . . . And the equivalent forums for a corporation are its place of incorporation and principal place of business." (Internal quotation marks omitted.)).

[4] It is undisputed that the shareholders' agreement was executed in 2012.

shareholders' agreement" and that he appended to his opposition an email from Robert A. Feiner, a Connecticut attorney with the firm Feiner Wolfson, which included an attachment, a proposed consent in writing in lieu of a meeting of the shareholders of Invata Holdings, that stated that "it is the position of the [b]oard of [d]irectors of [Invata Holdings] that said [2012] [s]hareholders' [a]greement does and should continue to apply to the shareholders of [Invata Holdings] . . . ." The court's factual finding regarding the applicability of the shareholders' agreement to Invata Holdings is not clearly erroneous; see, e.g., *Jackson* v. *Prince*, 231 Conn. App. 568, 573, 334 A.3d 517 (factual findings underlying court's decision on motion to dismiss will not be disturbed unless they are clearly erroneous), cert. denied, 353 Conn. 902, 341 A.3d 958 (2025); because it is supported by evidence of an email from Attorney Feiner, and, thus, we treat it as applying to Invata Holdings.[5]

The issue of whether a contract with an out-of-state defendant can establish sufficient minimum contacts with the forum state has been addressed recently by our Supreme Court in *North Sails Group, LLC* v. *Boards & More GmbH*, supra, 340 Conn. 266. Specifically, in that case our Supreme Court set forth the following relevant standard: "[A]n individual's contract with an out-of-state party alone [cannot] automatically establish sufficient minimum contacts in the other party's home forum . . . . Rather, we must evaluate the totality of the circumstances, including prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing . . . in determining whether the defendant purposefully established minimum contacts within the forum. . . .

"It is well established that, in evaluating the totality of the circumstances, it is the defendant's contacts

---

[5]Invata Holdings argues that, in the alternative, this court can affirm the trial court's granting of the motion to dismiss on the ground that the trial court's determination that § 33-929 (f) (1) authorized jurisdiction over Invata Holdings was based on a clearly erroneous finding that Invata Holdings agreed to be bound by the shareholders' agreement.

with the forum state, not those of the plaintiff, that are relevant. . . . Courts have repeatedly rejected reliance on any single factor and instead have examined all aspects of the contractual relationship between the parties, evaluating the extent, nature, and quality of the nonresident defendant's contacts with the forum state. . . . [T]he goal of the inquiry is to determine whether the contract and its surrounding circumstances demonstrate that the nonresident defendant reach[ed] out beyond one state and create[d] continuing relationships and obligations with citizens of another state . . . . Under those circumstances, the nonresident defendant is understood to have purposefully availed itself of the benefit of its activities in the forum state, and it may well be unfair to allow [it] to escape having to account in [the forum state] for consequences that arise proximately from such activities; the [d]ue [p]rocess [c]lause may not readily be wielded as a territorial shield to avoid interstate obligations that have been voluntarily assumed. . . . [T]he purposeful availment inquiry represents a rough quid pro quo: when a defendant deliberately targets its behavior toward the society or economy of a particular forum, the forum should have the power to subject the defendant to judgment regarding that behavior. . . . The cornerstones of this inquiry are voluntariness and foreseeability. . . .

"The significance to the inquiry of both voluntariness and foreseeability is evident in the court's explanation of the principles underlying the purposeful availment requirement . . . which ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts . . . or of the unilateral activity of another party or a third person . . . . Jurisdiction is proper . . . [when] the contacts proximately result from *actions by the defendant* [*itself*] that create a substantial connection with the forum [s]tate. . . . Thus [when] the defendant deliberately has engaged in significant activities within a [s]tate . . . or has created continuing obligations between [itself] and residents of the forum . . . [it] manifestly has availed [itself] of the privilege of conducting business there, and because [its]

activities are shielded by the benefits and protections of the forum's laws it is presumptively not unreasonable to require [it] to submit to the burdens of litigation in that forum as well. . . . In determining minimum contacts in a contracts case, courts must take a highly realistic approach that recognizes that a contract is ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction. . . . It is these factors—*prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing*—that must be evaluated in determining whether the defendant purposefully established minimum contacts with the forum." **(**Citations omitted; emphasis in original; internal quotation marks omitted.**)** Id., 275–79. "In evaluating the quality of a defendant's contacts, courts have considered the parties' actual course of dealings, the location of performance, the quality and quantity of any communications, the terms of the parties' contract, including any forum selection clause, and whether the defendant reached into the forum, including whether the defendant initiated contact." Id., 289.

The following background information bears repeating. Following the 2011 merger of Invata, Inc.—an entity that the plaintiff and Sheehan had incorporated in Connecticut—into Glen Road Systems, Inc.—a Pennsylvania corporation—the plaintiff entered into a shareholders' agreement with Glen Road Systems, Inc., in 2012. Eight years later, in 2020, after Glen Road Systems, Inc., had changed its name back to Invata, Inc., there was a reorganization such that Invata, Inc.'s then existing shareholders, which included the plaintiff, formed Invata Holdings—a holding company incorporated in Pennsylvania. Invata, Inc., was then designated as a subsidiary of Invata Holdings and converted into a limited liability company. As stated in the complaint, as part of the reorganization, Invata, Inc.'s ownership in Attabotics, a Canada based robotics company in which

Glen Road Systems, Inc., had invested, was distributed to Invata Holdings.

According to the plain terms of the shareholders' agreement, seven shareholders, including the plaintiff, entered into that agreement with Glen Road Systems, Inc. The agreement did not contemplate or require performance in Connecticut but, instead, delineated the number of shares held by each shareholder and set forth a governing structure for the management and disposition of such stock. It further provided that any notice, demand, offer or other written instrument required or permitted to be given should be either, depending on circumstance, sent to Glen Road Systems, Inc., in Conshohocken, Pennsylvania, or to one of its seven shareholders, who resided in various states, including Pennsylvania, Connecticut, Texas, Maine, and New Hampshire.[6] Additionally, the shareholders' agreement provides that it shall be construed according to the laws of the Commonwealth of Pennsylvania and the Pennsylvania Business Corporations Law. These provisions of the shareholders' agreement raise questions about the foreseeability that Invata Holdings could be haled into court in Connecticut. See *North Sails Group, LLC* v. *Boards & More GmbH*, supra, 340 Conn. 298 (contractual provisions raised serious questions regarding foreseeability that defendant could be haled into court in Connecticut where contract did not explicitly contemplate performance in Connecticut, included choice of law provision designating Wisconsin law as controlling, required defendant to send its royalty fees to Wisconsin bank, and provided that notices were required to be sent to counsel in Wisconsin).

In addition to the shareholders' agreement, the plaintiff relies on the following forum contacts: (1) retention of Connecticut based counsel Feiner Wolfson; (2) the use of Connecticut phone numbers by some shareholders

---

[6] As a result of the reorganization, the plaintiff, Sheehan, and Kuhn became the sole shareholders and the directors of Invata Holdings, and Labib later joined as a shareholder. The complaint alleges that Sheehan resides in Connecticut and Labib resides in Massachusetts, and the shareholders' agreement reflects that Kuhn resides in Pennsylvania.

to conduct business; **(3)** derivation of reported income through Invata, LLC; **(4)** that a director and shareholder **(**the plaintiff**)** of a closely held company with only four shareholders (Invata Holdings) resides and signed the shareholders' agreement in Connecticut; and **(5)** the forum contacts of Invata, Inc./Invata, LLC, are attributable to Invata Holdings.

Regarding the retention of the Connecticut based firm of Feiner Wolfson, the plaintiff argues that the firm represented the "Invata enterprise" since its inception and that Attorney Feiner played a central role in the "F reorganization"[7] of Invata, Inc., which gave rise to Invata Holdings. In support of his argument, the plaintiff appended to his objection an email from Attorney Feiner to Jeff Adler, a Pennsylvania attorney, describing Invata, Inc.'s corporate structure and stating that "I think we want to keep the same structure for the holding company . . . ." Attorney Feiner's email was in response to Attorney Adler's email indicating that the requisite forms were attached, noting that the name of the company to be formed is Invata Holdings, Inc., and suggesting a number of shares. Also appended to the opposition was an email from Damien Sibilla, Invata, Inc.'s chief financial officer, to Attorney Adler stating that the first step of the tax reorganization is to create a new Pennsylvania entity, Invata Holdings, as an S corporation[8] and asking for Attorney Adler's assistance because Invata

---

[7]Section 368 (a) (1) of title 26 of the United States Code, which categorizes several types of corporate reorganization by a corresponding letter, provides that the term " 'reorganization' " means, under subparagraph **(F)**, "a mere change in identity, form, or place of organization of one corporation, however effected . . . ."

[8]"A subchapter S corporation is a closely held business entity organized under the law of the state in which it is incorporated. One feature of such an entity is that it does not pay income taxes on its net earnings; rather, its income is attributed to its shareholders and must be reported by them to the taxing authorities as income to them, regardless of whether the income, in part or entirely, is actually distributed to the corporation's shareholders. . . . Each year, an S corporation provides a Schedule K-1 form to its shareholders that indicates the net income attributed to that shareholder." (Citations omitted.) *Yanavich* v. *Yanavich*, 228 Conn. App. 444, 446–47 n.2, 325 A.3d 1149 (2024).

Holdings is a Pennsylvania legal entity. These documents, revealing the legal assistance that was sought from both Connecticut and Pennsylvania attorneys for the reorganization of Invata, Inc., and the creation of a Pennsylvania holding company, Invata Holdings, do not evince purposeful availment in Connecticut by Invata Holdings, particularly in light of the fact that there is no indication that Attorney Feiner assisted Invata Holdings with the 2012 shareholders' agreement because Invata Holdings did not exist at that time.

Next, the plaintiff contends that some shareholders used Connecticut phone numbers to conduct business for Invata Holdings. In his affidavit, which was appended to his opposition, the plaintiff stated that, following the formation of Invata, Inc., Connecticut cell phone numbers were given to employees of Invata, Inc., whose principal place of business is in Canton, Connecticut, and that Sheehan used that cell phone number to "conduct Invata business through calls and texts"[9] and that the plaintiff discussed Invata's operation systems with Sheehan using that assigned phone number. That the plaintiff and Sheehan may have discussed issues pertaining to Invata Holdings using Connecticut based cell phone numbers obtained from Invata, Inc., is insufficient because these actions do not indicate that Invata Holdings, which is based in Pennsylvania and did not assign the Connecticut phone numbers, purposefully availed itself of the benefit and protections of Connecticut's laws. See, e.g., *Lyons* v. *Birmingham Law Office, LLC*, 224 Conn. App. 758, 779, 315 A.3d 391 (2024) ("[t]elephone and mail contacts are jurisdictionally insufficient unless the defendant projected himself by those means into [the forum state] in such a manner that he purposefully availed himself . . . of the benefits and protections of its laws" (internal quotation marks omitted)).

Additionally, the plaintiff's signing of the shareholders' agreement in Connecticut, his residence in

[9]A footnote in the plaintiff's affidavit explains that " 'Invata' " is used to refer "to the organization as a whole."

Connecticut, and his status as a shareholder and director are insufficient to establish jurisdiction. The plaintiff fails to cite any case law, nor are we aware of any, demonstrating that *his* contacts with the forum state are relevant. See, e.g., *North Sails Group, LLC* v. *Boards & More GmbH*, supra, 340 Conn. 276 ("[T]he relationship must arise out of contacts that the defendant himself creates with the forum [s]tate. . . . [Courts] have consistently rejected attempts to satisfy the defendant-focused minimum contacts inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum [s]tate." (Internal quotation marks omitted.)). Even if, however, we were to examine such contacts, they are merely fortuitous. In *North Sails Group, LLC*, our Supreme Court stated: "The existence of the contractual relationship alone . . . is evidence only of contact with the plaintiff, not with the forum. In that circumstance, the defendant's only connection to the forum is that the plaintiff resides there, which is precisely the kind of random and fortuitous contact that courts caution against relying on to conclude that jurisdiction is proper. The defendant presumably would have entered into the contractual relationship regardless of where the plaintiff was located." Id., 285–86. That reasoning likewise applies to the facts of the present case.

Next, the plaintiff argues that "Invata Holdings derived income through its wholly owned subsidiary, Invata, Inc. ([now known as] Invata, LLC) . . . . It is undisputed that, as a result of the [qualified subsidiary] election, Invata, LLC's financials are reported as belonging to Invata Holdings. Thus, through Invata, Inc., Invata Holdings maintained an operational and financial presence in the state, and its consolidated financial reporting reflects an acknowledgment that its revenues and liabilities remain intertwined with Connecticut based operations."

As an S corporation, Invata Holdings reports—for federal tax purposes—all of the income of its qualified subsidiary, Invata, LLC—which still exists separately under

state law.[10] The plaintiff's argument concerning derived income stems largely from his additional contention that the Connecticut contacts of Invata, Inc./Invata, LLC, which he argues has "deep and long-standing ties to Connecticut," are properly attributable to Invata Holdings. However, "it is a fundamental principle of corporate law that the parent corporation and its subsidiary are treated as separate and distinct legal persons even though the parent owns all the shares in the subsidiary and the two enterprises have identical directors and officers. Such control, after all, is no more than a normal consequence of controlling share ownership." (Internal quotation marks omitted.) *SFA Folio Collections, Inc.* v. *Bannon*, 217 Conn. 220, 232, 585 A.2d 666, cert. denied, 501 U.S. 1223, 111 S. Ct. 2839, 115 L. Ed. 2d 1008 (1991). Furthermore, "[t]he unilateral activity of an entity cannot subject a nonresident defendant to personal jurisdiction in the entity's forum. . . . Where two corporations are in fact separate, permitting the activities of the subsidiary to be used as a basis for personal jurisdiction over the

[10]"A [qualified Subchapter S subsidiary (QSub)] must be a domestic corporation, 100 percent of the stock of which is held by an S corporation. Only outstanding shares are taken into account in determining whether a subsidiary is wholly-owned. Share ownership for federal income tax purposes rather than legal ownership is controlling. Thus, if a parent S corporation owns a single-member LLC that is treated as a disregarded entity for federal income tax purposes, and the LLC holds 100 percent of the shares of a domestic corporation, the parent S corporation will be treated as owning all of the stock of the corporate subsidiary, and the parent is eligible to file a QSub election with respect to that corporate subsidiary. . . . A proper election to treat a subsidiary as a QSub means that for *federal income tax purposes the subsidiary is disregarded as a separate corporation, and all of the subsidiary's assets, liabilities, and items of income, deduction, and credit are treated as those of the parent S corporation.* When a QSub election is made for an existing corporation, the subsidiary is deemed to have liquidated into the parent S corporation. . . . Section 332 [of the Internal Revenue Code] technically requires the adoption of a plan of liquidation at a time when the subsidiary is 80 percent or more owned by the parent; however, *obviously a QSub will remain in existence under state law.* To resolve this seeming inconsistency, the regulations indicate that making a QSub election itself satisfies the section 332 plan of liquidation requirement." (Emphasis added; footnotes omitted.) M. Hess, "The Exaggerated Death of the Subchapter S Corporation—Part I," 14 Utah B.J. 22, 23–24 (2001).

parent violates this principle and thus due process. . . . [T]he primary purpose of the corporate form is to prevent a company's owners, whether they are persons or other corporations, from being liable for the activities of the company. Where corporate formalities have been observed, a company's owners reasonably expect that they cannot be held liable for the faults of the company. Thus, such owners do not reasonably anticipate being [haled] into a foreign forum to defend against liability for the errors of the corporation." (Internal quotation marks omitted.) *Hersey* v. *Lonrho, Inc.*, 73 Conn. App. 78, 85, 807 A.2d 1009 (2002). "[T]he mere incidence of stock ownership in or affiliation with a corporation, without more, is not a sufficient minimum contact [to satisfy the due process requirement and justify the exercise of personal jurisdiction over a nonresident parent corporation]." (Internal quotation marks omitted.) Id., 84.

The plaintiff, however, argues that Invata Holdings is Invata, Inc.'s legal successor, and, thus, its Connecticut contacts are attributable to Invata Holdings. The trial court did not address whether, as a legal matter, the contacts of a predecessor are properly attributable to a successor, an issue on which there exists a split of authority,[11] reasoning that "the plaintiff's complaint is silent as to any allegations of successor liability, and the plaintiff has not alleged any specific contacts by Invata, Inc., to support that the cause of action arises out of any contacts that Invata, Inc., had with Connecticut." We agree with the trial court and, likewise, do not address the issue of successor liability.

The plaintiff further contends that the Connecticut contacts of Invata, Inc./Invata, LLC, are properly attributed to Invata Holdings pursuant to alter ego principles. However, the use of alter ego theories—whereby the corporate veil is pierced in order to find the subsidiary to be the alter ego of its parent, thereby treating the two

---

[11]See *North Sails Group, LLC* v. *Boards & More GmbH*, supra, 340 Conn. 286 n.16 ("there appears to be a split of authority regarding whether a nonresident predecessor's minimum contacts may be imputed to a nonresident defendant in all cases or only in certain circumstances").

corporate entities as a single entity—for jurisdictional purposes has, "[e]xcept in very limited circumstances . . . become an anachronism." (Internal quotation marks omitted.) *Hersey* v. *Lonrho, Inc.*, supra, 73 Conn. App. 83. We, again, note that it is "a fundamental principle of corporate law that the parent corporation and its subsidiary are treated as separate and distinct legal persons even though the parent owns all the shares in the subsidiary and the two enterprises have identical directors and officers. Such control, after all, is no more than a normal consequence of controlling share ownership." (Internal quotation marks omitted.) Id. Whether to pierce the corporate veil constitutes a factual inquiry. Id., 86. The plaintiff did not raise in the trial court the issue of corporate veil piercing and, accordingly, the trial court did not make the requisite factual findings or otherwise address that issue in its decision. Accordingly, we do not review this issue, which was raised for the first time on appeal. See, e.g., *Hadden* v. *Capitol Region Education Council*, 164 Conn. App. 41, 43 n.3, 137 A.3d 775 (2016) ("[a]s a general matter, we do not decide issues raised for the first time on appeal" (internal quotation marks omitted)).

We turn to *North Sails Group, LLC,* in which our Supreme Court stated that, "in the life of a contractual relationship of the length involved here, it is difficult to imagine fewer contacts between the defendant [B&M] and the forum. Besides the long-term nature of the contractual relationship, the plaintiff relies on the following forum contacts: (1) B&M knowingly entered into a contract with the Connecticut based plaintiff; (2) B&M negotiated the contract by sending communications to the plaintiff in Connecticut; (3) the contract contemplated and even mandated that the plaintiff would perform its own obligations under the contract in Connecticut, which would result in Connecticut's being the locus of any harm the plaintiff would suffer as a consequence of a breach of the contract; (4) B&M maintained a nearly twenty year business relationship with the plaintiff in Connecticut, including a visit to the forum and sending

hundreds of reports, payments, and other communications to Connecticut; and **(5)** B&M breached the contract by contacting and injuring the plaintiff in Connecticut. . . . These contacts, however, do not focus on B&M's purposeful contact with the forum, which is limited to a single visit to the forum after the contract was executed, and occasional, ancillary communications." **(Footnote omitted.)** *North Sails Group, LLC* v. *Boards & More GmbH*, supra, 340 Conn. 290–91.

The forum contacts in the present case are strained, as were those in *North Sails Group, LLC*. The lack of any evidence or allegations that Invata Holdings—which did not exist in 2012—initiated contact with the plaintiff in relation to the shareholders' agreement or otherwise purposefully reached out into the forum, that the terms of the shareholders' agreement do not contemplate performance in Connecticut, and the lack of allegations or evidence that the shareholders' agreement was performed in Connecticut belies the plaintiff's contention that Invata Holdings purposefully availed itself of the benefits and protections of Connecticut's laws. See id., 299–300 **(**that defendant did not perform its contractual obligations in Connecticut and contract did not require it to do so weighed heavily against finding minimum contacts**)**.

The plaintiff, however, argues that, unlike *North Sails Group, LLC,* "the present case involves a Connecticut based director and shareholder asserting rights against a company that, through its structure and operations, has continuously engaged with Connecticut. Rather than being difficult to imagine fewer contacts between [Invata Holdings] and the forum, it is difficult to imagine more regular or substantial contacts with Connecticut: Invata Holdings' director, its long-time counsel, a significant shareholder, its historical revenues, and even the legal work that birthed the company—all are rooted in Connecticut." **(Internal quotation marks omitted.)** The plaintiff's alleged forum contacts, even if proven, however, do not weigh in favor of jurisdiction because they do not evince purposeful availment by Invata Holdings, or they

rely on the contacts of its subsidiary, which, under the circumstances of the present case, cannot be attributed to the parent company.

In sum, the plaintiff has failed to establish that Invata Holdings has sufficient minimum contacts with Connecticut to justify the exercise of personal jurisdiction. In light of this, we do not reach the next part of the due process analysis concerning whether the exercise of personal jurisdiction would be reasonable. See, e.**g.**, *North Sails Group, LLC* v. *Boards & More GmbH*, supra, 340 Conn. 314 ("[b]ecause the plaintiff failed to satisfy its burden regarding minimum contacts, we do not need to determine whether personal jurisdiction would be reasonable"). Therefore, we conclude that the trial court properly dismissed the complaint against Invata Holdings for lack of personal jurisdiction.

## II

The plaintiff next claims that the trial court, in ruling on the motion to dismiss, improperly overlooked Invata Holdings' alleged "calculated efforts to obstruct jurisdictional discovery, which not only undermined the integrity of the factual record but warranted sanctions under Practice Book § 13-14 (b) (3)." We are not persuaded.

Under Practice Book § 13-14, a court may sanction a party for noncompliance with the trial court's discovery orders; permissible sanctions include the entry of an order that the matters regarding which the discovery was sought or other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order. See Practice Book § 13-14 (b) (3).

The plaintiff filed a motion for an order of compliance or default as to Invata Holdings and requested, inter alia, a finding, pursuant to Practice Book § 13-14 (b) (3), that the court's personal jurisdiction over Invata Holdings be deemed established for purposes of the action. The court, *Morgan, J.*, ordered Invata Holdings to object

and/or respond to the plaintiff's second set of requests for production and denied all other relief requested in the plaintiff's motion. This ruling occurred following motions for compliance filed by both parties pursuant to, inter alia, §13-14, and the orders of the court compelling compliance. In his opposition to the motion to dismiss, the plaintiff argued that jurisdiction over Invata Holdings should be deemed established pursuant to §13-14 (b)(3). In ruling on the motion to dismiss, the court, *Smith, J.*, rejected this argument, stating that a motion for relief under §13-14 had not been claimed to the court for adjudication. The plaintiff does not challenge on appeal this reasoning but, rather, argues that this court should take into account the discovery violations of Invata Holdings when deciding the present appeal. Specifically, he contends that, although "this court need not find that default should have entered, it is impossible to ignore that [Invata Holdings] actively skewed the record by evading meaningful participation in jurisdictional discovery," which conduct "underscores why their claims cannot be accepted at face value, and why their credibility on jurisdictional matters is fundamentally compromised."

The inherent authority of a trial court to impose reasonable sanctions is derived from General Statutes §52-29[12] and from our rules of practice, adopted by the judges of the Superior Court in the exercise of their inherent rule-making authority. See, e.g., Practice Book §13-14; see also *Millbrook Owners Assn., Inc.* v. *Hamilton Standard*, 257 Conn. 1, 9–11, 776 A.2d 1115 (2001). On appeal, our role is not to second-guess the decision of the trial court and it is not to ask whether we "would have imposed a similar sanction but [rather our role is to decide] whether the trial court could reasonably conclude

[12]General Statutes §52-29 provides: "(a) The Superior Court in any action or proceeding may declare rights and other legal relations on request for such a declaration, whether or not further relief is or could be claimed. The declaration shall have the force of a final judgment.

"(b) The judges of the Superior Court may make such orders and rules as they may deem necessary or advisable to carry into effect the provisions of this section."

as it did *given the facts presented*. Never will the case on appeal look as it does to a [trial court] . . . .” (Emphasis in original; internal quotation marks omitted.) *Gutierrez* v. *Mosor*, 206 Conn. App. 818, 826, 261 A.3d 850, cert. denied, 340 Conn. 913, 265 A.3d 926 (2021). The plaintiff's argument that we should, essentially, impose a discovery sanction on Invata Holdings by deeming its appellate argument “fundamentally compromised” due to alleged discovery violations at the trial level has no basis in the law. Moreover, it is the plaintiff's burden, as the appellant, to demonstrate on appeal that his claims are sufficiently meritorious to warrant reversal of the trial court's judgment. As we detailed in part I of this opinion, he has not done so.

The judgment is affirmed.

In this opinion the other judges concurred.